[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Pike Cty. Coroner's Office,* Slip Opinion No. 2017-Ohio-8988.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-8988

THE STATE EX REL. CINCINNATI ENQUIRER *v.* PIKE COUNTY CORONER'S OFFICE.

THE STATE EX REL. GATEHOUSE MEDIA OHIO HOLDINGS II, INC., D.B.A. COLUMBUS DISPATCH, ET AL. *v.* PIKE COUNTY CORONER'S OFFICE ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Pike Cty. Coroner's Office,* Slip Opinion No. 2017-Ohio-8988.]**

*Mandamus—Coroner's records—R.C. 313.10(A)(2)(e)—Information redacted from requested autopsy reports is exempt from public disclosure while investigation is ongoing because requested reports are "[r]ecords of a deceased individual" within meaning of R.C. 313.10(A)(2)(e) and redactions were made to protect "confidential law enforcement investigatory records" within meaning of R.C. 313.10(A)(2)(e)—Writ, statutory damages, and attorney fees denied.*

(Nos. 2016-1115 and 2016-1153—Submitted July 11, 2017—Decided December 14, 2017.)

IN MANDAMUS.

_____

**O'CONNOR, C.J.**

{¶ 1} In these related original actions, relators, Cincinnati Enquirer ("the Enquirer") and GateHouse Media Ohio Holdings II, Inc., d.b.a. Columbus Dispatch, and reporter Holly R. Zachariah (collectively, "the Dispatch"), filed complaints seeking a writ of mandamus to compel the release of unredacted reports on the autopsies of eight members of the Rhoden and Gilley families who were murdered in Pike County in April 2016. Separately, the Enquirer moved for oral argument and the Dispatch moved to compel access to the unredacted autopsy reports filed under seal with this court. And the Dispatch and the Enquirer both seek an award of attorney fees and statutory damages for what they characterize as the untimely production of the redacted autopsy reports. We deny the writ, the motions, and the requests for attorney fees and statutory damages.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On April 22, 2016, eight people were found deceased in Pike County, Ohio, all of whom were members of the Rhoden or Gilley families. Over the next two days, the chief deputy coroner of Hamilton County conducted autopsies on the decedents. Respondent Pike County Coroner's Office ("PCCO") received the final autopsy reports on July 22, 2016.

{¶ 3} The Dispatch made a verbal request to PCCO and respondent David Kessler, M.D., the Pike County coroner, to inspect the final autopsy reports, pursuant to R.C. 149.43 and 313.10. PCCO denied the request.

{¶ 4} On July 26, 2016, the Dispatch then e-mailed a public-records request for the final autopsy reports to PCCO and the attorney general, again citing R.C. 149.43 and 313.10. On the same day, Robert Strickley Jr., a reporter for the Enquirer, e-mailed a request for the final autopsy reports to PCCO, citing R.C. 149.43.

2

**{¶ 5}** Also that same day, Dr. Kessler issued a press release in which he confirmed that his office was in possession of all eight final autopsy reports but denied all media requests for them. Dr. Kessler stated that the final autopsy reports were exempt from disclosure as "confidential law enforcement investigatory records."

**{¶ 6}** On July 29, 2016, the Enquirer filed in this court an original action against PCCO seeking a writ of mandamus to compel release of the final autopsy reports. On August 8, 2016, the Dispatch filed a separate original action in this court seeking the same relief. Both suits were filed before Dr. Kessler and the attorney general's office released redacted copies of the eight final autopsy reports on September 23, 2016. The unredacted final autopsy reports have not been released.

**{¶ 7}** After unsuccessful mediation attempts, PCCO moved to dismiss both actions. On February 22, 2017, we unanimously denied the motions to dismiss and granted alternative writs of mandamus directing the parties to submit evidentiary materials and merit briefs. 148 Ohio St.3d 1406, 2017-Ohio-573, 69 N.E.3d 747.

**{¶ 8}** Before the parties submitted their briefs, PCCO moved to submit unredacted copies of the autopsy reports and explanatory materials under seal for this court's in camera inspection. We granted the motion in part, permitting the unredacted autopsy reports to be filed under seal but without additional explanatory materials. 148 Ohio St.3d 1440, 2017-Ohio-1427, 72 N.E.3d 655. PCCO filed the unredacted autopsy reports under seal on May 3, 2017. The next day, the Dispatch moved to compel access to the sealed autopsy reports. On April 11, 2017, the Enquirer filed an unopposed request for oral argument.

## II. ANALYSIS

### A. Request for oral argument

**{¶ 9}** We have discretion to determine whether an original action merits oral argument. S.Ct.Prac.R. 17.02(A). In exercising that discretion, we consider

whether the case involves a matter of great public importance, complex issues of law or fact, a substantial constitutional issue, or a conflict among the courts of appeals. *State ex rel. BF Goodrich Co., Specialty Chems. Div. v. Indus. Comm.*, 148 Ohio St.3d 212, 2016-Ohio-7988, 69 N.E.3d 728, ¶ 23.

{¶ 10} This case involves a matter of great public importance: whether autopsy reports in open homicide investigations are public records and therefore available for public inspection. However, the remaining factors are not present. The case presents no constitutional question or division among the intermediate appellate courts, the relevant facts are few and uncontested, and the legal questions in the case are all matters of statutory interpretation that the parties have extensively briefed. Accordingly, we deny the Enquirer's request for oral argument.

## B. Motion to compel access

{¶ 11} We have consistently required in camera inspection of requested documents before determining whether they are exempt from disclosure under the Public Records Act, R.C. 149.43. *Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 2016-Ohio-1192, 49 N.E.3d 1296, ¶ 33. The Dispatch contends that it has a due-process right to participate in that inspection. But we considered and rejected the same argument in *State ex rel. Lanham v. DeWine*, 135 Ohio St.3d 191, 2013-Ohio-199, 985 N.E.2d 467:

> If the court were to require the disclosure of the subject records in discovery to permit relator to contest the applicability of a claimed exception, it would render the case moot. And [relator] can still contest the applicability of a claimed exception by challenging the validity of unsealed evidence that the public-records custodian submits to support its reliance on the exception. * * * Thus, due process does not prevent the court's consideration of the pertinent records submitted under seal for in camera review.

(Citation omitted.) *Id.* at ¶ 23. The Dispatch has not offered any basis to distinguish its asserted due-process right from that considered in *Lanham.* Thus, we deny the motion to compel access.

## C. The public-records mandamus petitions

### 1. Overview

{¶ 12} After conducting an autopsy, the coroner, deputy coroner, or pathologist must file in the coroner's office a detailed written report describing the observations made during the autopsy and the conclusions drawn therefrom. R.C. 313.13(A). Once filed, that report is expressly defined as a public record and therefore is available for public inspection. R.C. 313.10(A)(1) and (B).

{¶ 13} But R.C. 313.10(A)(1) is subject to multiple exceptions. One of those exceptions provides that "[r]ecords of a deceased individual that are confidential law enforcement investigatory records ['CLEIR'] as defined in section 149.43 of the Revised Code" are not public records. R.C. 313.10(A)(2)(e).

{¶ 14} The Dispatch and the Enquirer argue that as a matter of statutory construction, final autopsy reports can never qualify as CLEIR. And even assuming that the CLEIR exception can apply to some autopsy reports, the newspapers deny that any information contained in the Rhoden and Gilley reports actually satisfies the exception. This latter claim requires us to review the specific information that PCCO redacted from the autopsy reports submitted under seal.

### 2. Standard of review

{¶ 15} Mandamus is the appropriate remedy by which to compel compliance with the Public Records Act. *State ex rel. Physicians Comm. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6. The Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio

St.3d 374, 376, 662 N.E.2d 334 (1996). Exceptions to disclosure under the act are strictly construed against the record's custodian, who has the burden to establish the applicability of any claimed exception. *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10.

### 3. Analysis

{¶ 16} Under the Public Records Act, "[c]onfidential law enforcement investigatory records" are exempt from disclosure. R.C. 149.43(A)(1)(h). And although the coroner's-records statute generally deems "the records of the coroner" public records, R.C. 313.10(A)(1), the statute contains an exception for "[r]ecords of a deceased individual that are confidential law enforcement investigatory records," R.C. 313.10(A)(2)(e). The coroner's-records statute cross-references the Public Records Act and incorporates its definition of CLEIR. *Id*.

### a. Records of a deceased individual

{¶ 17} We first determine whether autopsy reports qualify as "[r]ecords of a deceased individual" pursuant to R.C. 313.10(A)(2)(e). That phrase, according to the Enquirer, "refers to a decedent's records, created prior to death, that come into the possession of the coroner." Autopsy reports, the newspapers argue, are "records of the coroner" and not protected from disclosure pursuant to R.C. 313.10(A)(2)(e).

{¶ 18} The Enquirer's definition is unpersuasive. Notably, the newspapers argue that documents must be prepared by law enforcement in order to qualify as CLEIR. But if that were correct, then such documents could never simultaneously be "[r]ecords of a deceased individual" as the Enquirer wishes to define the phrase. In other words, no document could ever satisfy the R.C. 313.10(A)(2)(e) CLEIR exception as it is construed by the Dispatch and the Enquirer.

{¶ 19} Unsurprisingly, the Enquirer offers no support for its claim that "[r]ecords of a deceased individual" includes only documents possessed by the deceased and created prior to death. And the Enquirer's statutory argument relies

on an unreasonably narrow construction of the word "of." According to the Enquirer, R.C. 313.10, and R.C. Chapter 313 more generally, "consistently use[]" the preposition "of" to "connote possession, ownership, or belonging." For example, the Enquirer contends, "the records of the coroner," as used in R.C. 313.10(A)(1), plainly means records belonging to the coroner, not records about or referring to the coroner. The Enquirer also points to the phrase "the body or remains of a deceased person," which appears repeatedly in R.C. 313.08.

{¶ 20} But the Enquirer oversimplifies the Revised Code's use of the preposition. R.C. 313.10(A)(2)(b) exemplifies the erroneous nature of the Enquirer's narrow interpretation of the word "of." That statute provides that "[p]hotographs *of* a decedent made by the coroner or by anyone acting under the coroner's direction or supervision" are not public records. (Emphasis added.) R.C. 313.10(A)(2)(b). Plainly, in this sentence, "of" means "about" or "depicting" the decedent, not "belonging to" the decedent.

{¶ 21} Apparently recognizing the flaw in its narrow construction of the word "of," the Enquirer implies that the phrase "[r]ecords of a deceased individual" may be ambiguous. It is our practice to resolve any doubts concerning the interpretation of the Public Records Act in favor of disclosure. *State ex rel. Glasgow v. Jones*, 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 13. When statutory language is ambiguous, it is appropriate to consider the legislative history. But there, too, the Enquirer's argument is undermined. In 2009, when the General Assembly amended R.C. 313.10 to insert the "[r]ecords of a deceased individual" language, the preamble to the bill announced that one purpose of the act was "to specify that certain records of a decedent relating to the criminal investigation of the decedent's death are not public records." 2008 Sub.H.B. No. 471. The act made two relevant changes to the statute: it added R.C. 313.10(A)(2)(e), the CLEIR exception at issue in this case. And it added R.C. 313.10(A)(2)(f), which excludes from the definition of "public records"

"[l]aboratory reports generated from the analysis of physical evidence by the coroner's laboratory that is discoverable under Criminal Rule 16." 2008 Sub.H.B. No. 471. It is logical to conclude that if laboratory reports about the decedent constitute the "records of a decedent" referred to in the preamble, then so too would the decedent's autopsy report.

{¶ 22} The newspapers' second statutory argument is vulnerable to the same objection as the first: it is not apparent what records, if any, would remain subject to the R.C. 313.10(A)(2)(e) CLEIR exception if their interpretation prevailed. A decedent's medical and psychiatric records are already exempt from disclosure by another provision of the statute, as is a decedent's suicide note. R.C. 313.10(A)(2)(c) and (d). What other records belonging to a deceased individual might a coroner routinely have in his or her possession? In an affidavit, Special Agent Michael D. Trout of the Ohio Bureau of Criminal Investigation ("BCI") described his personal experience on crime scenes and suggested that the answer is none:

> [A]ny personal effects or other items found on a body or in possession of the deceased at the time of death are ultimately collected, bagged, and kept by law enforcement as evidence. The coroner generally does not keep these types of items and the coroner generally does not collect and take evidence at the crime scene, other than the victim's body.

We must presume that the language chosen by the General Assembly was intended to be effective. Thus, we decline to adopt the newspapers' interpretation of "[r]ecords of a deceased individual."

{¶ 23} We hold that an autopsy report is a "[r]ecord[] of a deceased individual" within the meaning of R.C. 313.10(A)(2)(e).

8

b. Confidential law-enforcement investigatory records

{¶ 24} The Public Records Act defines "confidential law enforcement investigatory record[s]" as including

> any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:
>
> * * *
>
> (c) Specific confidential investigatory techniques or procedures or specific investigatory work product.

R.C. 149.43(A)(2).

{¶ 25} PCCO argues that the Rhoden and Gilley autopsy reports constitute "specific investigatory work product" as we defined the term in *State ex rel. Dayton Newspapers, Inc. v. Rauch*, 12 Ohio St.3d 100, 465 N.E.2d 458 (1984). The facts of *Rauch* are nearly identical to those presented herein: the Hocking County coroner, Dr. John Rauch, denied a public-records request from the Dayton Daily News for final autopsy reports on two homicide victims. At the time, the coroner's-records statute, R.C. 313.10, did not have its own CLEIR provision, so Dr. Rauch relied on the CLEIR exception in the Public Records Act, former R.C. 149.43(A)(2)(c), Am.Sub.S.B. No. 62, 138 Ohio Laws, Part I, 245, 246 (now R.C. 149.43(A)(1)(h)). He argued that the autopsy reports were subject to this exception because they contained information that investigators could use in their investigation—namely, descriptions of the types of wounds and the manner of their infliction. Dr. Rauch stated that police could test the credibility of witnesses by comparing their proffered testimony to the details provided in the autopsy reports.

{¶ 26} We unanimously denied the newspaper's petition for a writ of mandamus, agreeing with the coroner that the autopsy reports were "specific investigatory work product" and declaring that "[t]he autopsy is, in itself, an investigation." *Rauch* at 100. We noted that the report on an autopsy required as a result of a homicide is distinguishable from " 'routine factual reports' " that are subject to disclosure. *Id.* at 100-101, quoting *State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron*, 64 Ohio St.2d 392, 398, 415 N.E.2d 310 (1980); *see also* R.C. 313.131(B) (coroner shall perform autopsy only if, in his or her opinion, one is necessary). And we recognized that "the confidentiality of the contents of an autopsy report is essential to its effective use in further investigation by law enforcement personnel." *Id*. at 101.

{¶ 27} The Dayton Daily News argued that the case should be decided under R.C. 313.10, the more specific statute governing coroner's records, rather than under the Public Records Act. In 1984, when *Rauch* was decided, R.C. 313.10 declared simply that "[t]he records of the coroner, made by himself or by anyone acting under his direction or supervision [are] public records." G.C. 2855-11. According to the Dayton Daily News, an autopsy report, as a "record of the coroner," was plainly a public record.

{¶ 28} In the second part of the opinion, we rejected the premise of the newspaper's argument and concluded that an autopsy report was not a "record of the coroner" under former R.C. 313.09, the statute describing the records that the coroner was mandated to keep:

> The coroner shall keep a complete record of and shall fill in the cause of death on the death certificate, in all cases coming under his jurisdiction. * * * Such records shall be properly indexed, and shall state the name, if known, of every deceased person * * * , the place where the body was found, date of death, cause of death, and

all other available information. The report of the coroner and the detailed findings of the autopsy shall be attached to the report of each case.

Am.H.B. No. 750, 136 Ohio Laws, Part II, 2976. We construed this section to mean that an autopsy report was "an item separate from the other information the coroner is required to keep as a public record" and therefore was not subject to disclosure in the same manner. *Rauch*, 12 Ohio St.3d at 101, 465 N.E.2d 458.

{¶ 29} We definitively held in *Rauch* that information in some autopsy reports can be critical to an ongoing homicide investigation and therefore exempt from disclosure as CLEIR. The Dispatch and the Enquirer vigorously contend that *Rauch* has been superseded by subsequent amendments to R.C. 313.10. While that may be true in part, the General Assembly's post-*Rauch* amendments to R.C. 313.10 demonstrate a legislative desire to exempt some records maintained by the coroner's office from disclosure as CLEIR, just as we described in *Rauch*.

{¶ 30} The General Assembly has amended the coroner's-records statute, R.C. 313.10, twice since we decided *Rauch*. First, in 2006, the legislature added language bringing autopsy reports within the definition of public records. Am.Sub.H.B. No. 235, 151 Ohio Laws, Part IV, 7190, 7192. As a result, R.C. 313.10 now expressly states that "public records" includes "the detailed descriptions of the observations written during the progress of an autopsy and the conclusions drawn from those observations." R.C. 313.10(A)(1). Further reinforcing the point, the amended statute excludes preliminary autopsy reports from the definition of public records, R.C. 313.10(A)(2)(a), but contains no comparable exemption for final autopsy reports. As a result of the 2006 amendments, we conclude that our holding in *Rauch* that an autopsy report is not a "record of the coroner" is no longer valid.

**{¶ 31}** However, the General Assembly amended the coroner's-records statute again in 2009, adding the CLEIR exception in R.C. 313.10(A)(2)(e) that did not exist when *Rauch* was decided. 2008 Sub.H.B. No. 471 (effective Apr. 7, 2009). The new language in R.C. 313.10 declares that "the following records in a coroner's office are not public records: * * * [r]ecords of a deceased individual that are confidential law enforcement investigatory records as defined in section 149.43 of the Revised Code." R.C. 313.10(A)(2)(e).

**{¶ 32}** Thus, the General Assembly, through the addition of R.C. 313.10(A)(2)(e), endorsed what we had held in the first half of *Rauch*—that at least some autopsy reports remain protected from disclosure, at least for a temporary period, because they are CLEIR.

**{¶ 33}** Whether a document satisfies the CLEIR exception is determined by a two-part test: (1) whether the record is a confidential law-enforcement record and (2) whether release of the record would create a high probability of disclosure of any one of the statutorily enumerated types of information that is exempt from public disclosure. *See State ex rel. Musial v. N. Olmsted*, 106 Ohio St.3d 459, 2005-Ohio-5521, 835 N.E.2d 1243, ¶ 18-19. (Although the first dissenting opinion argues that we invented this two-part test in *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), it dates back to at least *State ex rel. Polovischak v. Mayfield*, 50 Ohio St.3d 51, 52, 552 N.E.2d 635 (1990). *See State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 56, 741 N.E.2d 511 (2001), citing *Polovischak* at 52.) Of the types of protected CLEIR, PCCO asserts that the Rhoden and Gilley autopsy reports contain "[s]pecific confidential investigatory techniques or procedures or specific investigatory work product," R.C. 149.43(A)(2)(c).

**{¶ 34}** The Dispatch and the Enquirer argue that final autopsy reports can never reveal specific investigatory work product because the coroner is not a law-enforcement official. This argument is unavailing. In attempting to support this

claim, the Enquirer misconstrues this court's opinion in *Steckman*, arguing that we required in that case "that 'specific investigatory work product' be 'prepared by law enforcement officials.' " We did not impose that requirement in *Steckman*. Instead, we recited the work-product rule, quoted the description in *Black's Law Dictionary* of materials exempt from disclosure under that rule—" 'any notes, working papers, memoranda or similar materials, prepared by attorneys [here, by law enforcement officials] in anticipation of litigation' "—and applied it to cases involving records held by law-enforcement officials. (Brackets sic.) *Steckman* at 434, quoting *Black's Law Dictionary* 1606 (6th Ed.1990).

{¶ 35} Indeed, the relevance of *Steckman* to this case is limited, at best. In *Steckman*, we specifically addressed "the use (and attempted use) of R.C. 149.43 (public records law) as a vehicle to obtain records from law enforcement officials and the contents of the files of prosecutors in pending criminal cases." *Id.* at 421. We "emphasize[d]" that the "decision only affects public records involved in pending criminal proceedings as that term is hereinafter construed." *Id.* at 426. The question before us today relates to an attempt to obtain records from a *coroner's office* in a *probable*, but not yet pending, criminal case. Indeed, none of the cases cited in *Steckman* concerned an effort to obtain records from a coroner's office, and the General Assembly did not even apply the CLEIR exception to coroner's records until 2009, 15 years after *Steckman* interpreted the exception as applied to law-enforcement officials and prosecutors.

{¶ 36} Although *Steckman* construed the CLEIR exception as it pertains specifically to records sought from law-enforcement agencies and prosecutors' offices, the Public Records Act defines CLEIR as any "record[s] that *pertain*[] to a law enforcement matter." (Emphasis added.) R.C. 149.43(A)(2). "[T]he statutory definition of [CLEIR] focuses on the nature of the record rather than upon the nature of the individual or agency holding the record." *Polovischak*, 50 Ohio St.3d at 53, 639 N.E.2d 83. In *Polovischak*, we specifically extended CLEIR protection

to records compiled by the Bureau of Workers' Compensation's Internal Security Committee, which had authority to investigate " 'all claims or cases of *criminal* violations, *abuse of office, or misconduct* on the part of bureau or [Industrial] [C]ommission employees.' " (Emphasis sic.) *Id.* at 52-53, quoting former R.C. 4121.122(D), Am.Sub.H.B. No. 222, 143 Ohio Laws, Part II, 3197, 3280. We reached this conclusion despite the facts that the investigative authority was not exercised by law-enforcement officials and was not restricted to investigating criminal violations. *See also State ex rel. Mahajan v. State Med. Bd. of Ohio*, 127 Ohio St.3d 497, 2010-Ohio-5995, 940 N.E.2d 1280, ¶ 50-53 (memorandum prepared by the State Medical Board's chief enforcement attorney protected from disclosure under the Public Records Act by the CLEIR exception for specific investigatory work product).

{¶ 37} Indeed, if the only records that qualify as CLEIR are those prepared by law enforcement, then R.C. 313.10(A)(2)(e) would shield nothing. There is no evidence that police investigators routinely leave their investigative reports in the custody of the coroner. If reports prepared by the coroner do not qualify as CLEIR, then R.C. 313.10(A)(2)(e) becomes a dead letter. We must presume that the General Assembly intended the entire coroner's-records statute to be effective. R.C. 1.47(B).

{¶ 38} And there is no doubt that the nature of the coroner's work in a homicide-related autopsy is investigative and pertains to law enforcement. The General Assembly has recognized that a coroner plays an integral role in law-enforcement investigations. For instance, to determine the cause of death, the coroner may issue subpoenas for witnesses, administer the witness oath, and inquire of witnesses how a death occurred. R.C. 313.17. The coroner may even commit witnesses to jail under certain circumstances, and a judge can, on the coroner's application, compel compliance on threat of contempt. *Id.* It cannot be said that the coroner lacks authority to investigate a violation of law when, without the

coroner's investigation, a murder could be mistaken for a natural death and no legal violation would be uncovered.

{¶ 39} As part of the coroner's efforts to determine whether the law was violated, the coroner may gather evidence and submit it to BCI as part of the investigation. R.C. 313.08(I). And in cases "in which, in the judgment of the coroner or prosecuting attorney, *further* investigation is advisable" (emphasis added), the coroner is statutorily required to "promptly deliver, to the prosecuting attorney of the county in which [the] death occurred, copies of all necessary records relating to [the] death." R.C. 313.09; *see also* R.C. 313.12(A) ("When any person dies as a result of criminal or other violent means * * * or in any suspicious or unusual manner, * * * the physician called in attendance, or any member of an ambulance service, emergency squad, or law enforcement agency who obtains knowledge thereof arising from the person's duties, shall immediately notify the office of the coroner of the known facts concerning the time, place, manner, and circumstances of the death, and any other information that is required pursuant to sections 313.01 to 313.22 of the Revised Code"). It is unreasonable to argue that a coroner, conducting a preliminary investigation to determine whether an offense was committed—for instance, whether a cardiac-arrest death was caused by a heart attack or a poisoning—is not participating in a law-enforcement investigation.

{¶ 40} Here, the unredacted portions of the autopsy reports contain substantial information, including the cause of death for each victim, general information about injuries, and observations about the victims' bodies including detailed descriptions of various organs. Among the redacted information are specific facts about gunshot wounds including the path and trajectory of bullets, specific identifying information such as scars or tattoos, descriptions of body placement, and toxicology results. The investigation into the deaths of these victims is ongoing.

**{¶ 41}** PCCO submitted affidavits of Dr. Kessler and BCI Special Agent Trout to explain the investigative nature of the autopsy reports and their relevance to the ongoing criminal investigation. Dr. Kessler averred that the "information in the * * * final autopsy reports reflect [sic] the type of specific information used by law enforcement to investigate a homicide." For instance, according to Dr. Kessler, "law enforcement can use the location and direction of * * * bullet wounds and tracks to recreate the scene of death." Toxicology reports can determine whether drugs "may be a contributing factor to the death, and might play a role in law enforcement's investigation." In some cases, "strangulation marks left on the body * * * might indicate if one or more people were involved in the death [which] helps the law enforcement investigation move forward * * *."

**{¶ 42}** Special Agent Trout described how the information contained in the Rhoden and Gilley autopsy reports can be used by law enforcement. According to Special Agent Trout, "[d]ecomposition can tell investigators many things such as time of death, conditions that the body was subjected to after death, and the time elapsed between death and autopsy." And "information from the coroner about the victims' wounds can give investigators a lot of details about how the crimes were committed and what was happening in the scene as the shots were fired. Other than the investigative team, only the perpetrator(s) of the crimes knows these details." Other redacted information "can potentially tell investigators what kind of gun and ammunition was used, other details about the perpetrator or the scene of death, and results of toxicology or other forensic information." "Information from final autopsy reports can also be used to triage tips." Investigators can compare autopsy information to that provided by alleged witnesses to evaluate their credibility. And Special Agent Trout advised that "[w]hen critical pieces of information are readily available in the media/public, it can be almost impossible to determine if a person is speaking from actual personal knowledge or just regurgitating what they have seen in the news or on social media."

**{¶ 43}** In *Rauch*, we acknowledged that the confidentiality of the contents of an autopsy report is "essential to its effective use in further investigation by law enforcement personnel." 12 Ohio St.3d at 100, 465 N.E.2d 458. Based on our review of the Rhoden and Gilley autopsy reports and the sworn statements of Dr. Kessler and Special Agent Trout, it is clear that the information redacted from the reports is precisely the type of information shielded from disclosure in *Rauch* due to its investigative value to law enforcement. *See also State ex rel. Cincinnati Enquirer v. Dept. of Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, ¶ 45 (emphasizing relevance of investigative value to public-records determination and recognizing that dash-cam-recording images with "concrete investigative value" may be withheld while images with little or no investigative value must be disclosed). As Special Agent Trout emphasized, the value of that information to investigators will be lost if it is prematurely disclosed.

**{¶ 44}** Applying the standard we set forth in *Rauch*, we conclude that the redactions to the final Rhoden and Gilley autopsy reports were made to protect records of the deceased that are CLEIR. Therefore, the information is exempt from public disclosure pursuant to the CLEIR exception while the investigation is ongoing. Accordingly, the Rhoden and Gilley reports satisfy both elements of the exception to disclosure under the coroner's-records statute.

### c.  The Confrontation Clause

**{¶ 45}** The Enquirer argues that interpreting the CLEIR exception, R.C. 313.10(A)(2)(e), as encompassing final autopsy reports will conflict with our Sixth Amendment jurisprudence. This is not so. Whether portions of a final autopsy report constitute CLEIR exempt from public disclosure and whether a final autopsy report is admissible at trial are distinct questions. It would be inappropriate to use one analysis for the other.

**{¶ 46}** The Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits the admission of "testimonial statements" of a witness

who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). But the United States Supreme Court has noted that business records are not testimonial in nature and thus may be admitted without violating a defendant's Sixth Amendment rights. *Id.* at 56. We have previously held that an autopsy report is admissible as a nontestimonial business record without the testimony of the medical examiner who conducted the autopsy. *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88.

{¶ 47} The Enquirer essentially argues that if we conclude that autopsy reports qualify as CLEIR—and therefore that they are prepared for the primary purpose of accusing a targeted individual or to provide evidence at a criminal trial—then they cannot be nontestimonial business records. But a plurality of the United States Supreme Court rejected a similar claim in *Williams v. Illinois*, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In *Williams*, a majority of the court determined that a DNA-profile report was nontestimonial. Although no majority of the court agreed on a single reason for the determination, a plurality opinion authored by Justice Alito and joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer concluded that the report was nontestimonial because its "primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time," *id.* at 84.

{¶ 48} We considered a similar question in *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, and concluded that

> an autopsy report that is neither prepared for the primary purpose of
> accusing a targeted individual nor prepared for the primary purpose
> of providing evidence in a criminal trial is nontestimonial, and its

> admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

*Id.* at ¶ 63.

{¶ 49} It cannot be disputed that a law-enforcement investigatory purpose is a different, broader category than a trial-preparation purpose such as gaining evidence against a defendant or accusing a targeted individual. Indeed, the plurality opinion in *Williams*, using a narrower version of the primary-purpose test than we have adopted in Ohio, identified one investigatory purpose—to catch an unknown perpetrator—that is not a trial-preparation purpose.[1] And there is no doubt, under our above analysis, that an autopsy with such a purpose would be investigatory and that the information in the report would be subject to redaction pursuant to the CLEIR exception. Indeed, as Special Agent Trout explained, information contained in such a report could be used to triage tips, narrow in on persons of interest, and test the credibility of those claiming to have knowledge of the crime.

{¶ 50} On the other hand, an autopsy report that is "prepared for the primary purpose of accusing a targeted individual" may also contain information, such as bullet trajectories known only to the perpetrator, that would still be detrimental to the investigation if publicized before the perpetrator's arrest, and such information may still be withheld under the CLEIR exception.

{¶ 51} This comparison evinces why two separate analyses are necessary— one to determine whether an autopsy report contains CLEIR and another to determine whether it is admissible at trial as a business record. Neither analysis

---

[1] In *Maxwell* at ¶ 55, we recognized that the plurality in *Williams* used this "narrowed definition of the primary-purpose test."

controls the other.[2] Whether the Rhoden and Gilley autopsy reports would be admissible at trial is an entirely different question from the one we consider here concerning whether the reports are public records and therefore subject to public disclosure.

{¶ 52} Once a perpetrator is identified and discovery commences in a criminal case, a different analysis will control the disclosure of autopsy reports, both as to the public and to the defendant. Further, the trial judge will be responsible for determining the reports' admissibility during judicial proceedings. Thus, whether an autopsy report may be admitted as a business record at trial and whether it must, almost certainly, be disclosed pursuant to Crim.R. 16 does not answer whether the report meets the CLEIR exception for purposes of public-records disclosure.

    d.   Availability of CLEIR in autopsy reports upon conclusion of investigation

{¶ 53} In reaching our decision today, we do not forget Justice Brandeis's maxim that " '[s]unlight is said to be the best of disinfectants,' " *Buckley v. Valeo*, 424 U.S. 1, 67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), quoting Brandeis, *Other People's Money and How the Bankers Use It* 62 (1933). Indeed, we have long been jealously protective of transparency in government and public access to records:

---

[2] This ruling does not make Ohio an outlier. Numerous other states restrict autopsy reports' availability while also recognizing that they may be admissible at a criminal trial as nontestimonial evidence. For instance, in California, autopsy reports may be exempt from disclosure under that state's public-records statute, Cal.Govt.Code 6254(f), as "investigatory * * * files compiled by any * * * local agency for * * * law enforcement * * * purposes." *Dixon v. Superior Court*, 170 Cal.App.4th 1271, 1273-1274, 88 Cal.Rptr.3d 847 (3d Dist.2009). But the fact that an autopsy report may be exempt from disclosure as a public record did not prevent the California Supreme Court from determining that an autopsy report was not testimonial evidence. *See People v. Dungo*, 55 Cal.4th 608, 621, 147 Cal.Rptr.3d 527, 286 P.3d 442 (2012). And in South Carolina, autopsy reports are exempt from disclosure as medical records under that state's public-records statute, *Perry v. Bullock*, 409 S.C. 137, 138-139, 761 S.E.2d 251 (2014), but autopsy reports may be admitted in a criminal proceeding without violating the confrontation rights of the defendant, *State v. Cutro*, 365 S.C. 366, 377-378, 618 S.E.2d 890 (2005).

Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance. *See, e.g.*, *State ex rel. Gannett Satellite Information Network, Inc. v. Petro* (1997), 80 Ohio St.3d 261, 264, 685 N.E.2d 1223; *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 157, 684 N.E.2d 1239. Public records afford an array of other utilitarian purposes necessary to a sophisticated democracy: they illuminate and foster understanding of the rationale underlying state decisions, *White* [*v. Clinton Cty. Bd. of Commrs.*, 76 Ohio St.3d 416, 420, 667 N.E.2d 1223 (1996)], promote cherished rights such as freedom of speech and press, *State ex rel. Dayton Newspapers, Inc. v. Phillips* (1976), 46 Ohio St.2d 457, 467, 75 O.O.2d 511, 351 N.E.2d 127, and "foster openness and * * * encourage the free flow of information where it is not prohibited by law." *State ex rel. The Miami Student v. Miami Univ.* (1997), 79 Ohio St.3d 168, 172, 680 N.E.2d 956.

(Ellipsis sic.) *Kish v. Akron*, 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 16.

{¶ 54} Thus, we wholeheartedly agree with the first dissenting opinion as to the importance of the media in gathering and disseminating information to the public. But the exceptions to disclosure are as much a part of the Public Records Act as are the general provisions that require disclosure. Although it is difficult to craft a statute that advances conflicting interests, that is exactly what the General Assembly has done here: it has provided that autopsy reports are public records unless they satisfy one of certain narrow exceptions, including confidential law-

enforcement investigatory records. While both dissenting opinions paste together a collage of arguments to make the case for narrowing the applicability of the CLEIR exception—to the point of nearly eliminating it—they do so without respect for the meaning and purpose of the CLEIR exception as expressed by the legislature. We do a disservice to the General Assembly by abrogating its intent through judicial opinions that advance a preordained conclusion but are offered under the pretense of strict construction.

{¶ 55} In this case, PCCO has released a great deal of the information contained in the Rhoden and Gilley final autopsy reports and has properly withheld, pursuant to R.C. 313.10(A)(2)(e), facts that are essential for the continuing investigation. The media and the public will always desire to know immediately the goings-on of a criminal investigation before the investigation has traveled its due course, but unfortunately, and in rare cases, time is required so that the path leading to a suspect is followed with certainty before an accused is brought forward. The purposes of the Public Records Act can and should be served without jeopardizing the public's right to confidence in criminal investigations and our legal system. All criminal investigations must be carried out thoroughly, unfettered by collateral interests.

{¶ 56} Our conclusion recognizes that certain information contained in autopsy reports falls under one of the narrow exceptions to public disclosure for a temporary period. The exception is recognized for the information in autopsy reports that, for a time, constitutes CLEIR. Once the criminal investigation ends, CLEIR contained in autopsy reports may assume the status of public records and become available to the public. In order that justice might be delivered to all, patience may be required of some.

{¶ 57} For the foregoing reasons, we deny the requested writ of mandamus to compel disclosure of the information redacted from the autopsy reports at issue in this case.

### D. Requests for attorney fees and statutory damages

**{¶ 58}** The Enquirer and the Dispatch seek statutory damages, arguing that PCCO failed to promptly release the redacted autopsy reports. Under former R.C. 149.43(C)(1) (in effect at the time the newspapers made the public-records requests at issue in this case), we may award statutory damages if a public record has not been provided promptly. 2015 Am.Sub.H.B. No. 64. But the statutory requirement is only that a copy of the document(s) must be made available within "a reasonable period of time." Former R.C. 149.43(B)(1), 2015 Am.Sub.H.B. No. 64; *State ex rel. Cincinnati Enquirer v. Deters*, 148 Ohio St.3d 595, 2016-Ohio-8195, 71 N.E.3d 1076, ¶ 23. What is reasonable depends on all the pertinent facts and circumstances. *State ex rel. Morgan v. Strickland*, 121 Ohio St.3d 600, 2009-Ohio-1901, 906 N.E.2d 1105, ¶ 10.

**{¶ 59}** Two months passed between relators' requests for the final autopsy reports and PCCO's release of the redacted reports to the public. Although we have found a delay as short as six days to be unreasonable, it " ' "depends largely on the facts in each case." ' " *State ex rel. Consumer News Servs., Inc. v. Worthington City Bd. of Edn.*, 97 Ohio St.3d 58, 2002-Ohio-5311, 776 N.E.2d 82, ¶ 37, 54, quoting *State ex rel. Wadd v. Cleveland*, 81 Ohio St.3d 50, 53, 689 N.E.2d 25 (1998), quoting *Black's Law Dictionary* 1214 (6th Ed.1990). Here, PCCO articulated a plausible explanation for the two-month delay—specifically, the magnitude of the investigation into the murders and the corresponding need to redact the reports with care. We find that two months was a reasonable amount of time in which to redact and release the reports. Therefore, statutory damages are unwarranted in this case.

**{¶ 60}** The Enquirer and the Dispatch also request that attorney fees be awarded in this case. But because we deny the writ, the newspapers are not entitled to attorney fees in connection with their seeking the release of the unredacted autopsy reports. Former R.C. 149.43(C)(2)(c), 2015 Am.Sub.H.B. No. 64. The

Enquirer notes that R.C. 149.43(C)(3)(b)(iii) now provides for attorney fees in the event that a public office

> acted in bad faith when the office * * * voluntarily made the public records available to the relator for the first time after the relator commenced the mandamus action, but before the court issued any order concluding whether or not the public office * * * was required to comply with division (B) of this section.

But that provision was added by 2016 Sub.S.B. No. 321, effective September 28, 2016. Because, as the Enquirer concedes, R.C. 149.43(C)(3)(b)(iii) was not yet in effect when PCCO produced the redacted records, the provision does not apply to this case. Therefore, the Enquirer and the Dispatch are not entitled to attorney fees.

### III. CONCLUSION

{¶ 61} For the foregoing reasons, we deny the Enquirer's and the Dispatch's motions and the requested writ of mandamus.

Writ and motions denied.

CELEBREZZE, O'NEILL, and PIPER, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by O'DONNELL, J.

FISCHER, J., dissents, with an opinion joined by O'DONNELL, J.

FRANK D. CELEBREZZE JR., J., of the Eighth Appellate District, sitting for FRENCH, J.

ROBIN N. PIPER, J., of the Twelfth Appellate District, sitting for DEWINE, J.

_____

**KENNEDY, J., dissenting.**

{¶ 62} " ' "[P]ublic records are the people's records, and * * * the officials in whose custody they happen to be are merely trustees for the people." ' " *Dayton Newspapers, Inc. v. Dayton*, 45 Ohio St.2d 107, 109, 341 N.E.2d 576 (1976),

quoting *State ex rel. Patterson v. Ayers*, 171 Ohio St. 369, 371, 171 N.E.2d 508 (1960), quoting 35 Ohio Jurisprudence, Inspection of Records: Generally, Section 41, at 45 (1934). "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

{¶ 63} When interpreting the Public Records Act, R.C. 149.43, we construe it liberally in favor of broad access, resolving " 'any doubt * * * in favor of disclosure.' " *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 5, quoting *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996). Our decisions are therefore guided by the text of the statute and the duty to strictly construe exceptions to disclosure against the public-records custodian, who has the burden to prove that an exception applies. *Id.* at ¶ 10, citing *State ex rel. Carr v. Akron*, 112 Ohio St.3d 351, 2006-Ohio-6714, 859 N.E.2d 948, ¶ 30, and *State ex rel. Beacon Journal Publishing Co. v. Akron*, 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 23. Because the majority departs from this duty, I dissent.

{¶ 64} The majority denies the request of relator Cincinnati Enquirer for oral argument, but because the controversy before the court involves an issue of great public importance, I would grant the Enquirer's request. Without the benefit of oral argument, the majority relies on *State ex rel. Dayton Newspapers, Inc. v. Rauch*, 12 Ohio St.3d 100, 465 N.E.2d 458 (1984), which was categorically overruled in our landmark decision in *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 434, 639 N.E.2d 83 (1994), *overruled in part on other grounds*, *State ex rel. Caster v. Columbus*, ___ Ohio St.3d ___, 2016-Ohio-8394, ___ N.E.3d ___, ¶ 47. The majority thereby fails to strictly construe the exception for "confidential

law enforcement investigatory records" ("CLEIR") set forth in R.C. 313.10(A)(2)(e) pursuant to the bright-line rule announced in *Steckman* defining CLEIR for purposes of R.C. 149.43(A)(2)(c). *See Steckman* at 434.

{¶ 65} Applying the definition of CLEIR established in *Steckman* to the current version of R.C. 313.10(A)(2)(e), I would hold that respondents, Pike County Coroner's Office and Pike County Coroner David Kessler (collectively, "PCCO"), have failed to prove that the CLEIR exception applies to the information redacted from the autopsy reports at issue here. Therefore, I would grant the requested writs of mandamus to compel the production of the unredacted records in this case and would award relators, Enquirer, GateHouse Media, d.b.a Columbus Dispatch, and reporter Holly Zachariah, court costs and reasonable attorney fees, pursuant to former R.C. 149.43(C)(1), 2015 Am.Sub.H.B. No. 64, which would be determined upon review of the filing of an itemized application by relators. I would not, however, grant statutory damages as relators failed to transmit their respective public-records requests either by hand delivery or certified mail as required by former R.C. 149.43(C)(1), 2015 Am.Sub.H.B. No. 64.

## I. REQUEST FOR ORAL ARGUMENT

{¶ 66} It is within our discretion to determine whether an original action merits oral argument. S.Ct.Prac.R. 17.02(A). In exercising that discretion, we consider " 'whether the case involves a matter of great public importance, complex issues of law or fact, a substantial constitutional issue, *or* a conflict among courts of appeals.' " (Emphasis added.) *State ex rel. BF Goodrich Co., Specialty Chems. Div. v. Indus. Comm.*, 148 Ohio St.3d 212, 2016-Ohio-7988, 69 N.E.2d 728, ¶ 23, quoting *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 111 Ohio St.3d 118, 2006-Ohio-5339, 855 N.E.2d 444, ¶ 15. In denying the Enquirer's request for oral argument, the majority concedes that this is a matter of great public importance but finds that the remaining factors are not present.

26

**{¶ 67}** However, in considering whether to allow oral argument under S.Ct.Prac.R. 17.02(A), we do not require that all four factors be present. In fact, we have previously granted oral argument in mandamus actions that involved matters of great public importance but none of the other factors. *See State ex rel. School Choice Ohio, Inc. v. Cincinnati Pub. School Dist.*, 147 Ohio St.3d 256, 2016-Ohio-5026, 63 N.E.3d 1183; *State ex rel. Cincinnati Enquirer v. Dept. of Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258.

**{¶ 68}** The benefit of oral argument cannot be overstated. "Oral argument provides a window to the decision-making process that is unavailable when there is no public scrutiny." DiVito, *Surviving the Death of Oral Argument*, 99 Ill.B.J. 188 (2011).

**{¶ 69}** The court's decision today will affect every county, newspaper, and homicide investigation in Ohio. By denying oral argument, the majority has perpetrated a great disservice to the citizens of Ohio in that it has deprived them of "the only opportunity * * * to see the [justices] at work and to witness at least some of the process that leads to appellate decisions," *id*. at 189. Accordingly, I would grant the Enquirer's request for oral argument.

## II. ANALYSIS

### A. *Steckman* categorically overruled *Rauch*

**{¶ 70}** The majority's declaration that "the relevance of *Steckman* to this case is limited, at best," majority opinion at ¶ 35, is misguided and based on the faulty premise that the definition of CLEIR as announced in *Steckman* applies only in pending criminal cases. While the majority attempts to limit *Steckman*, the reach of *Steckman* is much wider. When the General Assembly amended R.C. 313.10(A)(2)(e) to include an exception for CLEIR to the general rule that all autopsy reports are public records, it chose to define CLEIR with the phrase "as defined in section 149.43 of the Revised Code." R.C. 313.10(A)(2)(e). The

General Assembly did not provide a definition of CLEIR in the statutory amendment. Therefore, the legislature was relying on our definition of CLEIR as developed in *Steckman*.

{¶ 71} *Steckman* established a "bright line" rule that rendered "all cases (even though not specifically cited) that are contrary, in whole or in part," to *Steckman* "of no further force or effect," *Steckman*, 70 Ohio St.3d at 426, 429, 639 N.E.2d 83:

We recognize we have decided a plethora of cases that have not all, necessarily, been consistent. Differing fact patterns, the civil versus criminal context and the timing of R.C. 149.43 requests have brought about decision-making on a case-by-case basis. This * * * has in many ways hamstrung the proper administration of justice. We have avoided "bright line" rulings only because the lines were not very bright. Today's three cases, when combined, now place in clear focus many of the problems arising from sometimes inconsistent rulings. Thus, we now believe it is time to draw some bright lines in cases which involve the use of R.C. 149.43 by *any* person seeking release of records in pending criminal proceedings.

We are cognizant of, and have reviewed, all of our cases on this subject as well as a number of court of appeals and trial court decisions. We make this point so that any interested reader can be assured that even absent citation to a particular case, we have in fact considered, in reaching our decision herein, each matter pertinent to this decision.

(Emphasis added.) *Steckman* at 429.

28

{¶ 72} In *Steckman*, we set forth the following nonexhaustive list of cases that we had considered, several involving the CLEIR exception:

*State ex rel. Beacon Journal Publishing Co. v. Kent State Univ.* (1993), 68 Ohio St.3d 40, 623 N.E.2d 51 (confidential law enforcement investigatory records); * * * *State ex rel. Morales v. Cleveland* (1993), 67 Ohio St.3d 573, 621 N.E.2d 403 (trial preparation documents—postconviction); *State ex rel. Lawhorn v. White* (1993), 67 Ohio St.3d 158, 616 N.E.2d 888; *State ex rel. Hamblin v. Brooklyn* (1993), 67 Ohio St.3d 152, 616 N.E.2d 883 (trial preparation records and work product—postconviction); *State ex rel. Vindicator Printing Co. v. Watkins* (1993), 66 Ohio St.3d 129, 609 N.E.2d 551 (trial preparation and confidential law enforcement investigatory records); *State ex rel. Johnson v. Cleveland* (1992), 65 Ohio St.3d 331, 603 N.E.2d 1011 (trial preparation, investigatory work product, risk to witnesses and state/federal law exemptions); *State ex rel. Williams v. Cleveland* (1992), 64 Ohio St.3d 544, 597 N.E.2d 147 (trial preparation and confidential law enforcement investigatory exemptions— postconviction); * * * *State ex rel. Coleman v. Cincinnati* (1991), 57 Ohio St.3d 83, 566 N.E.2d 151 (trial preparation records—police department's homicide investigation files); *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1991), 57 Ohio St.3d 77, 566 N.E.2d 146 (investigatory and trial preparation records); *State ex rel. Zuern v. Leis* (1990), 56 Ohio St.3d 20, 564 N.E.2d 81 (trial preparation records); * * * *State ex rel. Multimedia, Inc. v. Whalen* (1990), 48 Ohio St.3d 41, 549 N.E.2d 167 (confidential law enforcement investigatory records); *State ex rel. Outlet*

*Communications, Inc. v. Lancaster Police Dept.* (1988), 38 Ohio St.3d 324, 528 N.E.2d 175 (arrest and intoxilyzer records—confidential law enforcement investigatory records; Furtherance of Justice Fund records); *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1988), 38 Ohio St.3d 79, 526 N.E.2d 786 ("*NBC I*") (investigatory work product exception); and *State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron* (1980), 64 Ohio St.2d 392, 18 O.O.3d 534, 415 N.E.2d 310 ("routine incident reports").

*Steckman* at 429-430.

{¶ 73} *Rauch*, upon which the majority relies, was decided ten years prior to *Steckman*. In *Rauch*, without defining "specific investigatory work product" as used in R.C. 149.43(A)(2)(c), we made the conclusory statement that an "autopsy is, in itself, an investigation" and held that an autopsy report therefore is exempt from disclosure. 12 Ohio St.3d at 100-101, 465 N.E.2d 458. This is precisely the type of analysis rebuked by the *Steckman* court. *See* 70 Ohio St.3d at 435, 639 N.E.2d 83 (noting that a prior decision's analysis of CLEIR exception for specific investigatory work product was "without citation to *any* authority except [*State ex rel.*] *Beacon Journal* [*Publishing Co. v. Univ. of Akron*]," which "did not deal with the specific work product exception" [emphasis sic]).

{¶ 74} Moreover, the *Rauch* court interpreted an earlier version of R.C. 313.10, and a close reading reveals the limitation of this decision. The court specifically employed traditional concepts of statutory construction and concluded that an autopsy report was not contained within a "record[] of the coroner" within the meaning of R.C. 313.10 and therefore was not a public record because an autopsy report is not encompassed in the General Assembly's description in R.C. 313.09 of coroner's records. *See Rauch* at 101.

{¶ 75} While "[s]*tare decisis* is 'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process,' " *Hohn v. United States*, 524 U.S. 236, 251, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998), quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), it "should not be, and has never been, used as the sole reason for the perpetuation of a stated rule of law which has proved to be unsound and unjust," *Carter-Jones Lumber Co. v. Eblen*, 167 Ohio St. 189, 197, 147 N.E.2d 486 (1958). The *Steckman* court realized that the inconsistency of its R.C. 143.49(A)(2) precedents had "hamstrung the proper administration of justice." *Steckman* at 429. Therefore, stare decisis was abandoned and all prior decisions that were contrary to the holding of *Steckman*, including *Rauch*, were overruled.

{¶ 76} Because of the sweeping language used in *Steckman*, the absence in *Steckman* of a specific citation to *Rauch* is of no consequence. *Rauch* was overruled by *Steckman* and is not the law. Therefore, the majority errs in relying on the court's conclusory statement in *Rauch* that an "autopsy" is an "investigation," 12 Ohio St.3d at 100, 465 N.E.2d 458.

**B**. **The majority misinterprets the CLEIR exception by failing to apply**
**_Steckman_**

{¶ 77} Despite the fact that *Rauch* has been overruled, the majority relies on it and in doing so, fails to use the two-step analysis established in *Steckman* that we and the courts of appeals have used to apply the CLEIR exception for over 20 years. *See, e.g.*, *State ex rel. Leonard v. White*, 75 Ohio St.3d 516, 664 N.E.2d 527 (1996); *Gannett Satellite Information Network, Inc. v. Petro*, 80 Ohio St.3d 261, 266-267, 685 N.E.2d 1223 (1997); *State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 56-57, 741 N.E.2d 511 (2001); *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175,

¶ 25-26; *State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 18; *State ex rel. Miller v. Ohio State Hwy. Patrol*, 2014-Ohio-2244, 14 N.E.3d 396, ¶ 14 (12th Dist.).

**{¶ 78}** To apply the bright-line rule for considering a claim for a record's exemption from disclosure as "specific investigatory work product" under R.C. 149.43(A)(2)(c), we conduct a two-step analysis, in which we first ask: Does the record pertain to a law-enforcement matter? *Steckman*, 70 Ohio St.3d at 433-434, 639 N.E.2d 83. If the record does pertain to a law-enforcement matter, then the record must also meet the definition of "specific investigatory work product" in order to be exempt from disclosure. *Id.*

**{¶ 79}** The General Assembly did not define the phrase "specific investigatory work product" for purposes of R.C. 149.43(A)(2)(c). Therefore, relying on the meaning of "attorney work product" for purposes of the attorney-client privilege, this court concluded in *Steckman* that "specific investigatory work product" means the " 'notes, working papers, memoranda, or similar materials, prepared by attorneys [here, by law enforcement officials] in anticipation of litigation.' " (Brackets sic.) *Id.* at 434, quoting *Black's Law Dictionary* 1606 (6th Ed.1990) (definition of "work product rule").

**{¶ 80}** Years after *Steckman*, in 2006, the General Assembly amended R.C. 313.10 and specifically defined autopsy reports as being public records. Am.Sub.H.B. No. 235, 151 Ohio Laws, Part IV, 7190, 7192. R.C. 313.10 was amended again in 2009 to its current form, which provides that "[r]ecords of a deceased individual that are confidential law enforcement investigatory records as defined in [R.C.] 149.43" are not public records and therefore are protected from disclosure. 2008 Sub.H.B. No. 471 (effective Apr. 7, 2009) ("H.B. 471").

**{¶ 81}** Because the General Assembly did not expressly provide a definition for CLEIR when it inserted that phrase in R.C. 313.10(A)(2)(e), we presume that

the General Assembly adopted this court's definition of CLEIR from *Steckman*. *See State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 25, citing *Spitzer v. Stillings*, 109 Ohio St. 297, 142 N.E. 365 (1924), syllabus.

{¶ 82} To determine, as the majority does, that the General Assembly's 2009 amendment adding the CLEIR exception to R.C. 313.10(A)(2) "endorsed what we had held in * * * *Rauch*," majority opinion at ¶ 32, violates established principles of statutory construction. The General Assembly " 'is presumed to know the decisions of this court, and, where it uses words or phrases that have been defined or construed by this court, it is presumed to have used them in the sense that they have been so defined or construed.' " *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 166, 462 N.E.2d 403 (1984), quoting *Tax Comm. v. Sec. Savs. Bank & Trust Co.*, 117 Ohio St. 443, 450, 159 N.E. 570 (1927). When the General Assembly inserted the CLEIR exception in R.C. 313.10(A)(2), it did so without providing a definition. Therefore, the General Assembly was aware that this court in *Steckman* had overruled *Rauch*. *Rauch* was of no force or effect, and the definition announced in *Steckman* controls.

{¶ 83} Moreover, when the General Assembly enacts a statute, it "does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 442-443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). As introduced in the Ohio House of Representatives in 2008, H.B. 471 originally contained two new exceptions to the general rule that autopsy reports are public records. The exception proposed as R.C. 313.10(A)(2)(e) provided that "[r]ecords of a deceased individual whose death is believed to be related to the actions of another person and believed to result potentially in the filing of criminal charges or the investigation of which remains ongoing or open" are not public records. Am.H.B. No. 471, as introduced in the 127th General Assembly, available at

http://archives.legislature.state.oh.us/bills.cfm?ID=127_HB_471_I (accessed Nov. 14, 2017).

{¶ 84} When H.B 471 was voted out of committee and sent to the full House, the bill had been amended and the above-quoted language had been deleted. In its place, the committee had inserted the CLEIR exception as it exists today in R.C. 313.10(A)(2)(e). *See* Am.Sub.H.B. 471, as reported by H. State Government and Elections (2008), available at http://archives.legislature.state.oh.us/bills.cfm?ID=127_HB_471_RH (accessed Nov. 14, 2017).

{¶ 85} Even the attorney general has asserted that *Rauch* has been superseded by the General Assembly's amendments to R.C. 313.10 in 2006 and 2009. *Ohio Sunshine Laws: An Open Government Resource Manual* 62 (2013), fn. 595 (*Rauch*'s holding that "an autopsy report may be exempt as a specific investigatory technique or work product" was "*superceded* [sic] *by* R.C. 313.10 (final autopsy reports are specifically declared public records)" [italics sic]). It was not until after this controversy arose that the attorney general recharacterized the effect of the amendments to R.C. 313.10 on *Rauch. Compare Ohio Sunshine Laws: An Open Government Resource Manual* 71 (2017), fn. 706 (*Rauch*'s holding that "an autopsy report may be exempt as a specific investigatory technique or work product" was "*modified by* R.C. 313.10" [italics sic]),[3] *with Ohio Sunshine Laws: An Open Government Resource Manual* 64 (2014), fn. 609 (*Rauch*'s holding that "an autopsy report may be exempt as a specific investigatory technique or work product" was superseded by R.C. 313.10); *Ohio Sunshine Laws: An Open*

---

[3] The document properties for the online PDF version of the 2017 edition of the attorney general's sunshine-laws manual indicate that it was uploaded to the attorney general's website on March 3, 2017—seven months after relators filed these mandamus actions. *See* http://www.ohioattorneygeneral.gov/Files/Publications-Files/Publications-for-Legal/Sunshine-Law-Publications/Sunshine-Laws-Manual.aspx (accessed November 14, 2017).

*Government Resource Manual* 67 (2015), fn. 644 (same); *Ohio Sunshine Laws: An Open Government Resource Manual* 67 (2016), fn. 653 (same).

{¶ 86} As further support for its conclusion that the unredacted autopsy reports requested in this case should not be released, the majority asserts that information detailing "gunshot wounds including the path and trajectory of bullets, specific identifying information such as scars or tattoos, descriptions of body placement, and toxicology results" should be shielded from public disclosure "due to its *investigative value* to law enforcement." (Emphasis added.) Majority opinion at ¶ 43. That consideration, however—the subjective preferences of law enforcement, including its determination that certain information has "investigative value"—was not added to the statutory text when the General Assembly amended R.C. 313.10. Therefore, the "investigative value" of information to law enforcement has no bearing on the meaning of the text of the statute. *See State v. Morgan*, ___ Ohio St.3d ___, 2017-Ohio-7565, ___ N.E.3d ___, ¶ 20.

{¶ 87} Moreover, whether information has "investigative value" is not considered under the two-step analysis established in *Steckman* and applied by its progeny. *See Leonard*, 75 Ohio St.3d 516, 664 N.E.2d 527; *Gannett Satellite Information Network, Inc.*, 80 Ohio St.3d at 266-267, 685 N.E.2d 1223; *Maurer*, 91 Ohio St.3d at 56-57, 741 N.E.2d 511; *Miller*, 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175, at ¶ 25-26.

{¶ 88} We have consistently rejected taking into account the subjective consideration of whether a document or recording contains some "investigative value" when analyzing the applicability of a public-records exception under R.C. 149.43(A). When analyzing the public-records exception in R.C. 149.43(A)(1) for "[t]rial preparation records," this court determined that a record is not exempt from disclosure just because a prosecutor had included the record in the prosecutor's file. *State ex rel. Carpenter v. Tubbs Jones*, 72 Ohio St.3d 579, 580, 651 N.E.2d 993

(1995). In *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, we rejected looking at the "particular content of the [requested] 911 tapes" as well as law enforcement's concerns about the consequences of releasing the 9-1-1 tapes. 75 Ohio St.3d at 378, 662 N.E.2d 334. In *Maurer*, we determined that because routine offense and incident reports are "subject to immediate release upon request" pursuant to *Steckman*, law enforcement's desire to keep the identity of an uncharged police officer confidential did not permit law enforcement to redact identifying information from an incident report. *Maurer* at 57. In *Dept. of Pub. Safety*, we stated that the CLEIR exception for specific investigatory work product does not shield "from disclosure all dash-cam recordings in their entirety merely because they contain potential evidence of criminal activity that may aid in a subsequent prosecution." 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, at ¶ 45. And in *Sage*, we did not consider the evidentiary value of a 9-1-1 recording, or law enforcement's desire to keep it confidential, even though the recording included a suspect's stating, "I'm a murderer, and you need to arrest me." 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, at ¶ 3, 17-18.

{¶ 89} The effect of today's majority opinion cannot be understated. Advancing the subjective consideration of whether a record or some information contained in a record has "investigative value" when analyzing the CLEIR exception under the Public Records Act amounts to building a foundation on quicksand—where the exception swallows the rule.

{¶ 90} "Value" is defined as "relative worth, utility, or importance." *Webster's Third New International Dictionary* 2530 (2002). The relative worth, utility, or importance of certain information is, by its very nature, in the eye of the beholder. This case bears out the very subjective nature of the inquiry and the slippery slope the majority has created.

**{¶ 91}** A thorough review of the redacted and unredacted autopsy reports reveals inconsistencies in the redactions. For example, in some of the autopsy reports, detailed descriptions of the victim's scars and tattoos is not redacted, while in other reports, all or most of that information is redacted. The majority's broadening of the CLEIR exception to include subjective considerations like "investigative value" or use of the information in testing the credibility of tipsters will lead to an inconsistent application of the definition of CLEIR announced in *Steckman* and will add to the uncertainty that we sought to avoid in that case. *See Steckman*, 70 Ohio St.3d at 429, 639 N.E.2d 83.

**{¶ 92}** As explained above, when the General Assembly enacted R.C. 313.10(A)(2)(e), it did not define CLEIR or modify R.C. 149.43(A)(2)(c) to include the subjective "investigative value" consideration that the majority relies upon. Members of the judicial branch, whose authority is limited to giving effect to the law as written—not rewriting it or legislating from the bench—writing "investigative value" into the statute is beyond our authority.

**{¶ 93}** This court in *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256 (2003), established a tripartite test to overrule precedent; once overruled, a precedent cannot be called forth from the grave like Lazarus. "In a word the genius of a great judge in the reading of statutes lies not in a bias for this or that tactical value, however worthy, but in his respect for the limits of his own function—for that grand strategic division of labor between legislature and court, between Nation and State." Mendelson, *Mr. Justice Frankfurter on the Construction of Statutes*, 43 Cal.L.Rev. 652, 673 (1955).

**C. The autopsy reports are not CLEIR pursuant to *Steckman***

**{¶ 94}** "In matters of statutory construction * * * it makes a great deal of difference whether you start with an answer or with a problem." Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 529 (1947). In this

case, if one begins with the problem—the meaning of CLEIR for purposes of the exception for specific investigatory work product—the answer is easy.

{¶ 95} Applying our two-step analysis and the definitive definition of CLEIR as announced in *Steckman*, I would hold that PCCO has failed to prove that the information redacted from the autopsy reports at issue here falls within the definition of CLEIR because the information neither "pertains to a law enforcement matter" nor reveals "specific investigatory work product," R.C. 149.43(A)(2)(c).

*1. CLEIR must "pertain[] to a law enforcement matter"*

{¶ 96} For a record to be considered a "confidential law enforcement investigatory record," the record must "pertain[] to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature." R.C. 149.43(A)(2). This requires the holder of the record to have the authority to investigate a violation of the law. *See State ex rel. Polovischak v. Mayfield*, 50 Ohio St.3d 51, 52-53, 552 N.E.2d 635 (1990) (noting authority of Internal Security Committee of Bureau of Workers' Compensation ("BWC") to investigate BWC employees who may have committed "criminal violations, abuse of office, or misconduct" [emphasis omitted] in determining whether committee's records of investigation of employee were exempt from disclosure); *State ex rel. Mahajan v. State Med. Bd.*, 127 Ohio St.3d 497, 2010-Ohio-5995, 940 N.E.2d 1280, ¶ 29 (in light of investigatory power of medical board, records compiled during investigation of physician pertained to a law-enforcement matter of an administrative nature). If the record holder lacks the authority to investigate, then the requested record does not pertain to a law-enforcement matter. *See State ex rel. Strothers v. Wertheim*, 80 Ohio St.3d 155, 158, 684 N.E.2d 1239 (1997) (plurality opinion) (CLEIR exception did not protect records of private ombudsman's office from disclosure because office "has no legally mandated enforcement or investigatory authority"); *Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, at ¶ 16-18 (outgoing telephone call placed by

a 9-1-1 operator to a murder suspect was a public record, not protected from disclosure under the exception for "[t]rial preparation records," in part because the 9-1-1 operator was not involved in criminal investigations).

{¶ 97} I agree with the majority that the coroner plays an important role in gathering facts after a death that might later be charged as a murder, but this role is limited "to decid[ing] on a diagnosis giving a reasonable and true cause of death," R.C. 313.15. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 57, quoting Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Cal.L.Rev. 1093, 1130 (2008) (autopsy report is "created 'for the primary purpose of documenting cause of death for public records and public health' "). The significance of the coroner's role, however, does not alter the fact that the coroner lacks the statutory authority to investigate a violation of the law—and thus, the autopsy does not "pertain[] to a law enforcement matter," R.C. 149.43(A)(2).

{¶ 98} The majority contends that a "coroner's work in a homicide-related autopsy is investigative" and points to R.C. 313.08(I), 313.09, 313.12(A), and 313.17 as support. Majority opinion at ¶ 38. These statutes do not support the majority's position.

{¶ 99} R.C. 313.08(I) is a permissive statute which permits a coroner to submit evidence "gathered in the investigation of a death to the bureau of criminal identification and investigation for assistance in determining whether the death resulted from criminal activity." This provision demonstrates that the coroner must rely on a state agency for an investigation as to whether criminal activity caused the death.

{¶ 100} R.C. 313.09 requires the coroner to send records to the county prosecutor when the coroner believes that "further investigation is advisable." This provision demonstrates that the coroner must rely on the prosecuting attorney and

local law enforcement to pursue an investigation of a violation of the law. *See Strothers*, 80 Ohio St.3d at 158, 684 N.E.2d 1239 (private ombudsman's office had "no legally mandated enforcement or investigatory authority" and instead ensured that allegations of child abuse and neglect were reported to the proper investigatory authority). And R.C. 313.12(A)'s requirement that in certain cases, the coroner be notified of the known facts concerning the time, place, manner, and circumstances of a death is congruent with the coroner's primary duty to determine the cause and manner of death. *See* R.C. 313.15.

{¶ 101} Without a doubt, the General Assembly instills broad authority and latitude in coroners to determine the cause and manner of death, but R.C. 313.17 is merely supportive of that duty and does not make a coroner a law-enforcement officer. Further, it does not enlarge a coroner's limited purpose of determining the cause and manner of death.

{¶ 102} Contrary to the majority's assertion, R.C. Chapter 313 lacks any language that instills the coroner with the authority to investigate a violation of the law. *Compare Polovischak*, 50 Ohio St.3d at 52-53, 552 N.E.2d 635, quoting former R.C. 4121.122(D), Am.Sub.H.B. No. 222, 143 Ohio Laws, Part II, 3197, 3280 (BWC Internal Security Committee had authority to " 'investigate all claims or cases of criminal violations, abuse of office or misconduct on the part of' " BWC employees); *Mahajan*, 127 Ohio St.3d 497, 2010-Ohio-5995, 940 N.E.2d 1280, at ¶ 33, quoting R.C. 4731.22(F)(1) (medical board " 'shall investigate evidence that appears to show that a person has violated any provision of this chapter or any rule adopted under it' ").

{¶ 103} The coroner gathers facts that are used by law enforcement and prosecutors for criminal prosecutions. Law enforcement, not the coroner, investigates any violation of the law that occurred. The coroner's role is not to investigate a violation of the law but to investigate the cause and manner of death.

The majority fails to recognize that the coroner is one degree removed from those law-enforcement officials who are empowered to investigate a murder. Therefore, an autopsy in a homicide case does not "pertain[] to a law enforcement matter" within the meaning of R.C. 149.43(A)(2), and it is not exempt from disclosure under the CLEIR exception.

*2. R.C. 149.43(A)(2)(c): Specific investigatory work product*

{¶ 104} As discussed above, the majority attempts to limit this court's landmark decision in *Steckman*, in which we initially defined "specific investigatory work product" in R.C. 149.43(A)(2)(c). 70 Ohio St.3d at 434, 639 N.E.2d 83. Nevertheless, our case law requires that autopsy reports must disclose "specific investigatory work product" to be considered CLEIR. To qualify for this "very narrow exception[]," *State ex rel. Police Officers for Equal Rights v. Lashutka*, 72 Ohio St.3d 185, 188, 648 N.E.2d 808 (1995), a record must constitute (1) " 'notes, working papers, memoranda, or similar materials,' " (2) prepared by law-enforcement officials, (3) in anticipation of criminal litigation. *Steckman* at 434, quoting *Black's Law Dictionary* at 1606. All three prongs must be established; the failure to meet one prong means that the requested record must be disclosed. The unredacted autopsy reports requested in this case fail to meet any of the three prongs.

{¶ 105} First, the autopsy reports are not "notes, working papers, memoranda, or similar materials." The majority describes the information redacted from the autopsy reports as

> general information about injuries, and observations about the victims' bodies including detailed descriptions of various organs. Among the redacted information are specific facts about gunshot wounds including the path and trajectory of bullets, specific

identifying information such as scars or tattoos, descriptions of body
placement, and toxicology results.

Majority opinion at ¶ 40.

**{¶ 106}** The autopsy reports at issue document factual information
regarding the appearance of the deceased individuals' bodies. This kind of factual
information—describing who, what, where, and how—constitutes a public record
when contained within a law-enforcement incident report. *See Steckman* at
paragraph five of the syllabus ("work product exception does not include ongoing
routine offense and incident reports"). The autopsy reports are devoid of the
coroner's theories as to who perpetrated the killings.

**{¶ 107}** The second prong of the definition of "specific investigatory work
product" requires that the record was prepared by law-enforcement officials.
*Steckman*, 70 Ohio St.3d at 434, 639 N.E.2d 83. We have rejected an interpretation
of the CLEIR exception for specific investigatory work product that would shield
dash-cam recordings from disclosure "merely because they contain potential
evidence of criminal activity that may aid in a subsequent prosecution." *Dept. of
Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, at ¶ 45.
Nevertheless, the majority relies on the affidavits of Dr. Kessler and Special Agent
Michael Trout of the Ohio Bureau of Criminal Investigation to support withholding
the unredacted autopsy reports because the information contained in them would
be useful to law enforcement in investigating the crimes.

**{¶ 108}** The attorney general has concluded that a county coroner does not
qualify as a "law enforcement officer" for purposes of either the Revised Code or
the Rules of Criminal Procedure. 1998 Ohio Atty.Gen.Ops. No. 98-033, at 5.
Instead, as noted above, the coroner's primary duty and purpose is to determine the
cause and manner of death. *See Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9

N.E.3d 930, at ¶ 57. Similar to the 9-1-1 operator in *Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, at ¶ 18, the coroner gathers facts and prepares autopsy reports as part of his routine duties. Coroners "perform autopsies in a number of situations, only one of which is when a death is potentially a homicide." *Maxwell* at ¶ 59. The potential that autopsy reports may be used by law enforcement in a criminal prosecution does not elevate a coroner to a law-enforcement official. Therefore, the unredacted autopsy reports fail to meet the second prong of the definition of "specific investigatory work product."

{¶ 109} The potential that autopsy reports may be used in a criminal prosecution also does not transform the purpose of a report routinely prepared to determine and memorialize the cause and manner of death into a document prepared in anticipation of litigation. Under the third prong of its definition, "specific investigatory work product" is strictly construed to include only those records that are "compiled in anticipation of litigation," *Steckman* at paragraph five of the syllabus, as opposed to routinely generated records that may someday be of use in a criminal prosecution.

{¶ 110} Lastly, our Confrontation Clause jurisprudence is helpful because in it, we have analyzed whether evidence was prepared in anticipation of litigation and therefore is testimonial such that its admission in the absence of a witness's testimony would violate a defendant's right under the Sixth Amendment to the United States Constitution to confront the witnesses against him. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 82. The majority dismisses reliance on this jurisprudence because whether a document is admissible at trial and whether a document is a public record are "distinct questions." Majority opinion at ¶ 45. While I agree that these questions are different, our answers to the question whether material was prepared in anticipation of litigation should not depend on the nature of the larger legal issue giving rise to the question. In *Craig*,

we concluded that autopsy reports " 'are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.' " *Craig* at ¶ 82, quoting *People v. Durio*, 7 Misc.3d 729, 734, 794 N.Y.S.2d 863 (N.Y.Sup.2005), quoting *Crawford v. Washington*, 541 U.S. 36, 56, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We reaffirmed this reasoning in *Maxwell*, in which, applying the primary-purpose test, we reasoned that autopsy reports are "created 'for the primary purpose of documenting cause of death for public records and public health.' " *Maxwell* at ¶ 57, quoting Zabrycki, 96 Cal.L.Rev. at 1130.

{¶ 111} The majority, after examining the same cases, concludes that these holdings are not applicable, stating, "It cannot be disputed that a law-enforcement investigatory purpose is a different, broader category than a trial-preparation purpose such as gaining evidence against a defendant or accusing a targeted individual." Majority opinion at ¶ 49. Instead of relying on *Steckman*, which restricts the CLEIR exception for specific investigatory work product to records "compiled in anticipation of litigation," 70 Ohio St.3d 420, 639 N.E.2d 83, at paragraph five of the syllabus, the majority relies on a plurality opinion of the United States Supreme Court that rejected a Confrontation Clause challenge to the admission of a record because it was "not prepared for the primary purpose of accusing a targeted individual," *Williams v. Illinois*, 567 U.S. 50, 84, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). However, this phrase does not appear in *Steckman*, in which we defined "specific investigatory work product" as information "compiled in anticipation of litigation." *Steckman* at paragraph five of the syllabus.

{¶ 112} The majority substantially broadens the scope of records that can be considered specific investigatory work product because information used in "accusing a targeted individual" is a much broader category than records "compiled in anticipation of litigation." This broader category based on *Williams* would

embrace any material that law enforcement might use in building a case against a criminal defendant. The majority does not attempt to explain how its reasoning comports with our prior decisions interpreting the meaning of the CLEIR exception for specific investigatory work product. The majority's reliance on *Williams* is contrary to our precedent interpreting the meaning of "specific investigatory work product" in the CLEIR exception. *See Steckman* at paragraph five of the syllabus (holding that police incident reports do not constitute specific investigatory work product); *Dept. of Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, at ¶ 45 ("declin[ing] to adopt an interpretation of the investigative-work-product exception that would shield from disclosure all dash-cam recordings in their entirety merely because they contain potential evidence of criminal activity that may aid in a subsequent prosecution").

{¶ 113} We should not abandon the bright-line rule established in *Steckman* that defines "specific investigatory work product" as records "compiled in anticipation of litigation." It would be illogical in a public-records case to declare that an autopsy report is prepared in anticipation of litigation and shielded from disclosure when we have already held—over a constitutional challenge of a defendant facing a possible death sentence if convicted—that an autopsy report is prepared in the ordinary course of business and therefore admissible in court pursuant to the business-record hearsay exception. *See Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 63; *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 88. Because the autopsy reports at issue here were not created in anticipation of litigation, the redacted portions cannot be withheld under the CLEIR exception for "specific investigatory work product," R.C. 149.43(A)(2)(c).

{¶ 114} The majority decries both dissenting opinions for disrespecting the "meaning and purpose of the CLEIR exception as expressed by the legislature" and

for doing this great "disservice to the General Assembly" under the "pretense of strict construction," majority opinion at ¶ 54, but "[l]egislation has an aim * * *. That aim, that policy is not drawn, like nitrogen, out of air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose." Frankfurter, 47 Colum.L.Rev. at 538-539.

{¶ 115} In R.C. 313.10 the General Assembly sought to make all autopsy reports public records subject to very narrow exceptions. The exception the legislature chose to enact that applies here is "[r]ecords of a deceased individual that are confidential law enforcement investigatory records as defined in section 149.43 of the Revised Code," R.C. 313.10(A)(2)(e).

{¶ 116} Because the General Assembly did not define CLEIR in R.C. 313.10, it relied on our definition of CLEIR as announced in *Steckman*. Had the legislature intended another definition, it would have said so.

{¶ 117} The only disservice done to the language of the statute and to the legislature is done at the hands of the majority by inserting its own policy-making decisions into the language of the statute. A body of four thereby elevates its policy preferences over the balanced and reasoned decision-making of the whole of the General Assembly.

[T]he courts are not at large. * * * They are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature. * * * A judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship

of policy-making might wisely suggest, construction must eschew interpolation and evisceration. He must not read in by way of creation. He must not read out except to avoid patent nonsense or internal contradiction.

Frankfurter, 47 Colum.L.Rev. at 533. "[T]he only sure safeguard against crossing the line between adjudication and legislation is an alert recognition of the necessity not to cross it and instinctive, as well as trained, reluctance to do so." *Id.* at 535.

### D. **Statutory Damages, Attorney Fees, and Costs**

{¶ 118} Relators e-mailed their respective public-records request to PCCO. To be entitled to statutory damages, however, the request had to be transmitted by either hand delivery or certified mail. Former R.C. 149.43(C)(1), 2015 Am.Sub.H.B No. 64. Therefore, relators are not entitled to an award of statutory damages.

{¶ 119} Neither of the subsections in former R.C. 149.43(C)(2)(b), 2015 Am.Sub.H.B. No. 64, providing for mandatory attorney fees apply. However, I would order discretionary reasonable attorney fees in this case based on former R.C. 149.43(C)(2)(b), 2015 Am.Sub.H.B. No. 64. A well-informed public office would have released the full autopsy reports because of the attorney general's guidance in the sunshine-laws manual that *Rauch* had been superseded by the General Assembly's amendments to R.C. 313.10. Moreover, the attorney general had issued an opinion opining that a coroner is not a law-enforcement official, and under our definition of specific investigatory work product in *Steckman*, autopsy reports are not subject to the CLEIR exception in R.C. 313.10(A)(2)(e). Additionally, the public policy expressed in R.C. 313.10 is that autopsy reports are public records.

### III. CONCLUSION

{¶ 120} For the foregoing reasons, I would grant oral argument and would grant the requested writs of mandamus to compel the production of the unredacted autopsy reports because PCCO has failed to prove that the CLEIR exception applies to the information redacted from the reports. Additionally, I would award relators court costs and reasonable attorney fees, pursuant to former R.C. 149.43(C)(1), 2015 Am.Sub.H.B. No. 64, which would be determined on review of the filing of an itemized application by relators. I would not, however, grant statutory damages as relators failed to transmit their respective public-records requests either by hand delivery or certified mail as required by former R.C. 149.43(C)(1), 2015 Am.Sub.H.B. No. 64.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**FISCHER, J., dissenting.**

{¶ 121} I respectfully dissent and would grant the requested writs of mandamus. Relators, Cincinnati Enquirer, GateHouse Media, d.b.a. Columbus Dispatch, and reporter Holly Zachariah, are entitled to the final autopsy reports that they requested. Based on a plain reading of the relevant statutory provisions, the final autopsy reports requested are "the detailed descriptions of the observations written during the progress of an autopsy and the conclusions drawn from those observations filed in the office of the coroner under [R.C. 313.13(A)]" ("13(A) Records"). 13(A) Records are public records subject to disclosure. R.C. 313.10(A)(1) and (B). 13(A) Records are not exempt from disclosure because they are distinct from "records of a deceased individual that are confidential law enforcement investigatory records" ("10(A)(2)(e) Records") and the other types of records exempt from disclosure under R.C. 313.10(A)(2). *See* R.C. 313.10(A)(2) and 313.10(G)(1). If the General Assembly wishes to alter those provisions, it may

do so, but the provisions as currently worded require that the final autopsy reports be released.

## I.  LEGAL ANALYSIS

### A.  Under R.C. 313.10(A)(1), final autopsy reports are public records

{¶ 122} Relators assert that the requested final autopsy reports are public records pursuant to R.C. 313.10(A)(1) and 149.43.  Records of the coroner, including but not limited to "the detailed descriptions of the observations written during the progress of an autopsy and the conclusions drawn from those observations filed in the office of the coroner under [R.C. 313.13(A)]" are public records.  R.C. 313.10(A)(1).  Both relators and respondents, Pike County Coroner's Office and Pike County Coroner David Kessler (collectively, "PCCO"), acknowledge that the final autopsy reports constitute 13(A) Records.  I agree that the final autopsy reports requested by relators are 13(A) Records and are, therefore, public records.

### B.  Final autopsy reports are not 10(A)(2)(e) Records

{¶ 123} PCCO argues that the requested final autopsy reports are exempt from disclosure as public records because they are also "records of a deceased individual that are confidential law enforcement investigatory records" pursuant to R.C. 313.10(A)(2)(e).  PCCO argues that a plain reading of the statute, with particular focus on the language "[e]xcept as otherwise provided in this section" included in R.C. 313.10(A)(1), demonstrates that the final autopsy reports fall within the 10(A)(2)(e) Records exception.  The majority generally agrees with this conclusion.

{¶ 124} However, to conclude that the final autopsy reports constitute 10(A)(2)(e) Records is to ignore a plain reading of the text of the statute *and* to render part of the statute superfluous.  13(A) Records and 10(A)(2)(e) Records are separate and distinct types of records under R.C. 313.10(A) and 313.10(G)(1).  For

this reason, the final autopsy reports are not 10(A)(2)(e) Records and are not exempt from disclosure pursuant to R.C. 313.10(A)(2)(e).

### 1. Principles of Statutory Interpretation

{¶ 125} The text of the statute is the primary and initial means of explaining a law. *E.g.*, *Hughes v. Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). "When construing a statute, we first examine its plain language and apply the statute as written when the meaning is clear and unambiguous." *Medcorp, Inc. v. Dept. of Job & Family Servs.*, 121 Ohio St.3d 622, 2009-Ohio-2058, 906 N.E. 1125, ¶ 9. Ambiguity exists only when the statutory language is "capable of bearing more than one meaning." *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16.

{¶ 126} We must give effect to the words used, refraining from inserting or deleting words. *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 53-54, 524 N.E.2d 441 (1988). "The words used must be afforded their usual, normal, and/or customary meanings." *Medcorp* at ¶ 9. "[W]ords in a statute do not exist in a vacuum." *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 19. We remain careful "not to 'pick out one sentence and disassociate it from the context' " but instead focus our attention on the " 'four corners of the enactment' " in order to determine legislative intent. *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8, quoting *Black Clawson Co. v. Evatt*, 139 Ohio St. 100, 104, 38 N.E.2d 403 (1941). If a statute is unambiguous, "inquiry into legislative intent, legislative history, public policy, the consequences of an interpretation, or any other factors identified in R.C. 1.49 is inappropriate." *Dunbar* at ¶ 16; *accord State v. Brown*, 142 Ohio St.3d 92, 2015-Ohio-486, 28 N.E.3d 81, ¶ 10.

{¶ 127} " 'No part [of the statute] should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative.' " (Brackets sic.) *State ex rel.*

*Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 19, quoting *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917).

### 2. *Plain-Reading Analysis of R.C. 313.10*

{¶ 128} The plain language of the text of R.C. 313.10(A) demonstrates that 13(A) Records and 10(A)(2)(e) Records are separate and distinct types of records. R.C. 313.10(A)(1) states:

> Except as otherwise provided in this section, the records of the coroner who has jurisdiction over the case, *including, but not limited to*, the detailed descriptions of the observations written during the progress of an autopsy and the conclusions drawn from those observations filed in the office of the coroner under [R.C. 313.13(A)], made personally by the coroner or by anyone acting under the coroner's direction or supervision, are public records.

(Emphasis added.) The above provision provides a nonexhaustive list of specific records of the coroner that are public records. *See Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 14; *State Farm Mut. Auto. Ins. Co. v. Grace*, 123 Ohio St.3d 471, 2009-Ohio-5934, 918 N.E.2d 135, ¶ 27. 13(A) Records, i.e., final autopsy reports, are the example of public records that was explicitly identified by the General Assembly in this provision.

{¶ 129} In contrast to R.C. 313.10(A)(1), which identifies final autopsy reports as public records, R.C. 313.10(A)(2) provides the General Assembly's separate, specific, and exhaustive list of the records in the coroner's office that "are *not* public records." (Emphasis added.) In this list, the General Assembly included 10(A)(2)(e) Records, among other records, that are not public records. *See* R.C. 313.10(A)(2)(a) through (f). 13(A) Records are *not* included in this list of specific,

nonpublic records of the coroner. Because 13(A) Records are not included in this exhaustive list of nonpublic records of the coroner, they are public records subject to disclosure. This conclusion comports with the general rule of statutory construction expressio unius est exclusio alterius, which provides that "the expression of one or more items of a class implies that those not identified are to be excluded." *State v. Droste*, 83 Ohio St.3d 36, 39, 697 N.E.2d 620 (1998).

{¶ 130} PCCO argues that because R.C. 313.10(A)(1) includes the phrase "[e]xcept as otherwise provided in this section," 13(A) Records can constitute 10(A)(2)(e) Records. But this argument ignores the clear structure and language of R.C. 313.10(A). Records of the coroner are generally public records unless they are specifically exempted from disclosure. R.C. 313.10(A)(1) and (2). The only exemptions listed are those in R.C. 313.10(A)(2) and, as previously noted, 13(A) Records are *not* listed among these exemptions. Therefore, PCCO's argument fails.

{¶ 131} The text of R.C. 313.10(G)(1) further supports the conclusion that 13(A) Records are distinct from 10(A)(2)(e) Records. That provision lists the "[f]ull and complete records of the coroner"; the list includes, but is not limited to, all the records listed in R.C. 313.10(A)(1) and (2)—thus, the list specifically includes both 13(A) Records and 10(A)(2)(e) Records. R.C. 313.10(G)(1)(a) and (f). R.C. 313.10(G) states:

> As used in this section:
>
> (1) "Full and complete records of the coroner" includes, but is not limited to, the following:
>
> *(a) The detailed descriptions of the observations written by the coroner or by anyone acting under the coroner's direction or supervision during the progress of an autopsy and the conclusions drawn from those observations that are filed in the office of the coroner under [R.C. 313.13(A)];*

(b) Preliminary autopsy and investigative notes and findings made by the coroner * * *;

(c) Photographs of a decedent made by the coroner * * *;

(d) Suicide notes;

(e) Medical and psychiatric records provided to the coroner * * * under [R.C. 313.091];

*(f) Records of a deceased individual that are confidential law enforcement investigatory records as defined in [R.C. 149.43]*;

(g) Laboratory reports generated from the analysis of physical evidence by the coroner's laboratory that is discoverable under Criminal Rule 16.

(Emphasis added.) The General Assembly's inclusion of both types of records in the text of the list of the "[f]ull and complete records of the coroner" establishes that 13(A) Records and 10(A)(2)(e) Records are separate and distinct types of records of the coroner.

{¶ 132} The majority's determination that 13(A) Records, i.e., final autopsy reports, constitute 10(A)(2)(e) Records renders R.C. 313.10(G)(1)(a) superfluous. The majority's reading of the statute effectively subsumes any and all 13(A) Records within the 10(A)(2)(e) Records exception and fails to treat each type of record distinctly, as directed by the statute. *See* R.C. 313.10(G)(1)(a) and (f). Because we must give effect to "every word, phrase, sentence, and part of the statute," *Carna*, 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, at ¶ 18, to avoid interpretations that render a provision meaningless or inoperative, I cannot support the majority's conclusion that the requested final autopsy reports are exempt from public disclosure as 10(A)(2)(e) Records.

{¶ 133} Although the desire to protect the confidentiality of investigatory records is a laudable and more-than-understandable goal, we must not read the

10(A)(2)(e) Records exception as a catchall provision for any record that may be useful to an investigation, including final autopsy reports. Interpreting 13(A) Records to be 10(A)(2)(e) Records not only ignores a plain reading of the statute but also is comparable to rewriting the statute to include the 10(A)(2)(e) Records exception as an umbrella provision to all records of the coroner. This court must refrain from rewriting the statute on the basis that it thereby improves the law. *Seeley v. Expert, Inc.*, 26 Ohio St.2d 61, 71, 269 N.E.2d 121 (1971). The General Assembly can rewrite the statute if it so desires, but that is not our role as part of the judicial branch. *See* Article II, Section 1 and Article IV, Section 1, Ohio Constitution; *State v. Smorgala*, 50 Ohio St.3d 222, 224, 553 N.E.2d 672 (1990).

{¶ 134} Therefore, in order to avoid reading R.C. 313.10 in such a manner as to make parts of the statute superfluous, I conclude that a plain reading of R.C. 313.10(A)(1) and (2) compels the conclusion that the requested final autopsy reports are public records pursuant to R.C. 313.10(A)(1) and are not exempt as 10(A)(2)(e) Records under R.C. 313.10(A)(2)(e). Since we can resolve this issue based on a plain reading of R.C. 313.10, this court should not engage in an analysis or review of the legislative intent, legislative history, public policy, or the consequences of an interpretation. *See Dunbar*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, at ¶ 16.

{¶ 135} Because relators have demonstrated by clear and convincing evidence that the requested final autopsy reports are R.C. 313.13(A) public records and that PCCO, as custodian of those records, has a clear legal duty to provide relators with the records pursuant to R.C. 313.10(A)(1) and 149.43(B), I conclude that relators are entitled to the requested writs of mandamus.

### C. Statutory damages, attorney fees, and court costs

{¶ 136} Relators also request reasonable attorney fees, statutory damages, and court costs. I conclude that relators are not entitled to statutory damages but should be awarded reasonable attorney fees and court costs.

### 1. Statutory Damages

**{¶ 137}** I agree with the majority that relators are not entitled to statutory damages as provided under former R.C. 149.43(C)(1), 2015 Am.Sub.H.B. No. 64. However, I would deny relators statutory damages not based on the majority's finding that PCCO redacted and released the final autopsy reports within a reasonable amount of time but because relators failed to submit their public-records requests by hand delivery or certified mail pursuant to former R.C. 149.43(C)(1). *See State ex rel. DiFranco* v. *S. Euclid*, 8th Dist. Cuyahoga No. 97823, 2012-Ohio-5158, ¶ 3; *compare State ex rel. Caster v. Columbus*, __ Ohio St.3d __, 2016-Ohio-8394, __ N.E.3d __, ¶ 52.

### 2. Attorney Fees

**{¶ 138}** The majority denies the requested writs of mandamus and therefore concludes that relators are not entitled to attorney fees under former R.C. 149.43(C)(2)(c), 2015 Am.Sub.H.B. No. 64. Because I would grant relators the requested writs of mandamus, I would also determine whether relators should be awarded attorney fees.

**{¶ 139}** "If the court renders a judgment that orders the public office or the person responsible for the public record to" produce requested public records, attorney fees may be awarded to the requesting party. Former R.C. 149.43(C)(2)(b), 2015 Am.Sub.H.B. No. 64. The statute provides circumstances listed in former R.C. 149.43(C)(2)(b)(i) and (ii) in which the court *shall* award attorney fees ("mandatory attorney fees"). *Id.* Relators, however, are not entitled to mandatory attorney fees under former R.C. 149.43(C)(2)(b)(i) or (ii) as PCCO provided its initial response to the public-records request within the time allowed and did not promise relators a specific time that the records would be produced.

**{¶ 140}** This court *may* award relators attorney fees pursuant to former R.C. 149.43(C)(2)(b) ("discretionary attorney fees") if PCCO did not promptly prepare

the public records and make them available within a reasonable period of time as required by R.C. 149.43(B)(1), 2015 Am.Sub.H.B. No. 64.

{¶ 141} PCCO argues that relators should not be granted any attorney fees, even discretionary attorney fees, because PCCO acted in accordance with former R.C. 149.43(C)(2)(c). Specifically, PCCO asserts that it "served the public policy of ensuring a successful law enforcement investigation of the Pike County homicides."

{¶ 142} Arguably, *State ex rel. Dayton Newspapers, Inc. v. Rauch*, 12 Ohio St.3d 100, 465 N.E.2d 458 (1984), supported PCCO's assertion that it had a "reasonabl[e] belie[f]" that the final autopsy reports contained confidential law-enforcement investigatory records and were, therefore, exempt as 10(A)(2)(e) Records that PCCO could withhold and thereby serve the public interest.

{¶ 143} PCCO denied the public-records request for the final autopsy reports in total and then later released portions of the reports. Therefore, PCCO's release of the redacted final autopsy reports demonstrates that PCCO did *not* believe that the *unredacted portions*, which PCCO originally withheld, fell under the 10(A)(2)(e) Records exception. Thus, as a matter of logic, once relators requested the records, PCCO was required to redact them promptly and release the redacted reports within a reasonable period of time. *See* former R.C. 149.43(C)(2)(b) and (B)(1).

{¶ 144} PCCO released the redacted autopsy reports to relators 59 days after relators' requests. The majority asserts (for purposes of determining whether relators are entitled to statutory damages) that this is a reasonable amount of time in which to redact and release the reports, specifically due to the magnitude of the investigation into the murders and the corresponding need to redact the reports with care. I disagree.

{¶ 145} As recognized by the majority, whether public records were released within a reasonable period of time depends largely on the facts of each

case. *See State ex rel. Consumer News Serv., Inc. v. Worthington City Bd. of Edn.*, 97 Ohio St.3d 58, 2002-Ohio-5311, 776 N.E.2d 82, ¶ 37. PCCO had a duty to promptly prepare and release the unredacted portions of the final autopsy reports, meaning " ' "without delay and with reasonable speed." ' " *Id.*, quoting *State ex rel. Wadd v. Cleveland*, 81 Ohio St.3d 50, 53, 689 N.E.2d 25 (1998), quoting *Black's Law Dictionary* 1214 (6th Ed.1990). PCCO argues that "[t]he two months it took for redactions to be made to these eight reports to protect information crucial to one of the largest criminal investigation [sic] conducted by the state is not unreasonable." PCCO may be exaggerating its burden. PCCO consulted directly with the attorney general's office to redact the eight autopsy reports. The autopsy reports were consistent in organization and general descriptions of the examinations. The reports totaled 66 pages, meaning that redactions were made to about one and one-tenth of a page per day. After reviewing both the redacted and unredacted autopsy reports, I conclude that taking 59 days to redact and release the 66 pages of the autopsy reports was not reasonable.

{¶ 146} Therefore, I would hold that PCCO failed to provide the final autopsy reports within a reasonable period of time pursuant to former R.C. 149.43(B)(1) and that relators should be awarded discretionary attorney fees.

### 3. Court Costs

{¶ 147} Because I would grant relators' requests for writs of mandamus ordering PCCO to comply with R.C. 149.43(B) and 313.10(A) and (B), I would award relators court costs pursuant to former R.C. 149.43(C)(2)(a), 2015 Am.Sub.H.B. No. 64.

## II. CONCLUSION

{¶ 148} Relators requested final autopsy reports that are public records pursuant to R.C. 313.10(A)(1), and those records are not exempt from disclosure as 10(A)(2)(e) Records under R.C. 313.10(A)(2)(e). I respectfully dissent and

conclude that relators are entitled to the requested writs of mandamus and should be awarded attorney fees and court costs.

O'DONNELL, J., concurs in the foregoing opinion

————————————

Graydon, Head & Ritchey, L.L.P., John C. Greiner, and Darren W. Ford, for relator Cincinnati Enquirer.

Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Marion H. Little Jr., and Matthew S. Zeiger, for relators GateHouse Media Ohio Holdings II, Inc., d.b.a. Columbus Dispatch, and Holly R. Zachariah.

Michael DeWine, Attorney General, and Sarah E. Pierce and Ryan L. Richardson, Assistant Attorneys General, for respondents, Pike County Coroner's Office and David Kessler, M.D.

Carpenter, Lipps & Leland, L.L.P., Michael H. Carpenter, and Caitlin E. Vetter, urging denial of the writ for amicus curiae Ohio State Coroners Association.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Michael J. Friedmann, Assistant Prosecuting Attorney, urging denial of the writ for amicus curiae Ohio Prosecuting Attorneys Association.

————————————